IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

JAN 1 4 2002

 CLERK

| | |
|---|---|
| THE LOUISIANA HOUSE OF REPRESENTATIVES; )<br>by and through CHARLES W. DEWITT, in )<br>his official capacity as Speaker of )<br>the Louisiana House of Representatives;)<br>and CHARLES EMILE BRUNEAU, JR. in his )<br>official capacity as Speaker *Pro* )<br>*Tempore* of the Louisiana House of<br>Representatives | CASE NUMBER  1:02CV00062<br><br>JUDGE: James Robertson<br><br>DECK TYPE: 3-Judge Court<br><br>DATE STAMP: 01/14/2002 |

        Plaintiffs,

v.

JOHN ASHCROFT, in his official
capacity as Attorney General of the
United States of America

        Defendants

------------------------------------------

## COMPLAINT FOR DECLARATORY JUDGMENT

The LOUISIANA HOUSE OF REPRESENTATIVES, CHARLES W. DEWITT
and CHARLES EMILE BRUNEAU, JR. respectfully submit the following
in support of their action for declaratory judgment that the
House of Representatives' redistricting plan, Act 3, Second
Extraordinary Session of 2001 ("Act 3, 2001, 2nd Ex. Sess.") does
not have the purpose and will not have the effect of denying or
abridging the right to vote on account of race in violation of
Section 5 of the Voting Rights Act, 42 U.S.C. 1973c ("Section 5"
or "preclearance").

**Parties**

1.

Plaintiff Louisiana House of Representatives --along with
the Louisiana Senate -- is the governmental entity with the
primary authority to create and adopt a redistricting plan for

the election of the 105 representatives, as required under LOUISIANA CONST. ART. III, Section 6(A) and with the delegated authority and responsibility pursuant to House Concurrent Resolution 13 ("HCR 13") to obtain Section 5 preclearance in an administrative proceeding from the United State Attorney General or a declaratory judgement from a three-judge court convened by the United States District Court for the District of Columbia. (A copy of HCR 13 is attached as Exhibit A).

2.

Plaintiffs Speaker Charles W. DeWitt and Speaker *Pro Tempore* Charles Emile Bruneau, Jr., are two officers who are authorized to act on behalf of the Louisiana House of Representatives in the exercise of all the duties and obligations as established in the Constitution and laws of Louisiana, including the responsibility to seek Section 5 preclearance for a duly adopted redistricting plan for the election of the members of Louisiana House of Representatives.

3.

Louisiana is a State within the United States of America and is a "covered jurisdiction" under Section 4 of the Voting Rights Act, 42 U.S.C. 1973b, and as such is prohibited from enacting or seeking to administer any standard, practice, or procedure with respect to voting unless or until Section 5 preclearance has been obtained.

2

4..

Defendant John Ashcroft, the Attorney General of the United States, is authorized under Section 5 of the Voting Rights Act to review submissions of changes in standards, practices, or procedures with respect to voting to determine whether the submitting authority has carried its burden of demonstrating that the proposed change does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color or membership in a language minority group.

**Jurisdiction and Law**

5.

This is an action for declaratory judgment pursuant to 42 U.S.C. 1973c and 28 U.S.C. 2201 for the purpose of determining that the redistricting plan for the Louisiana House of Representatives adopted on October 12, 2001, Act 3, 2001, 2nd Ex. Sess. does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color in violation of Section 5 of the Voting Rights Act.   (A copy of Act 3, Second Extraordinary Session of 2001 is attached as Exhibit B, accompanied by maps and related population and demographic data).

6.

Subject matter jurisdiction of this action is conferred upon this Court by 42 U.S.C. 1973c and 28 U.S.C. 1331(a).

3

7.

This action is one that must be determined by a three-judge panel for the District Court of the District of Columbia, in accordance with Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, and 28 U.S.C. 2284.

**Louisiana House of Representatives' 2001 Redistricting Process**

8.

The responsibility and authority to redistrict the House of Representative's 105 districts (as prescribed by La. Const. Art III, Sec. 3; R.S. 24:35.4) is conferred upon the State Legislature pursuant to La Const., Art III, Sec. 6(A) and is required by the Fourteenth Amendment of the United States Constitution, Section 1, in each decennium in which the release of the Census indicates that an existing districting plan has an overall maximum deviation among its districts in excess of 10 percent or $\pm 5$ percent from the ideal district population. See, Gray v. Sanders, 372 U.S. 378 (1963)(establishing the one-person, one-vote principle).

9.

The process by which the Louisiana House of Representatives created its redistricting plan included input from nearly -- and an opportunity for input from -- all of the incumbent Representatives; public hearings conducted in various regions of the State: New Orleans, Lafayette, Shreveport, Grambling (north central Louisiana) and Many (west Louisiana); 15 public meetings of the Subcommittee on Reapportionment ("Subcommittee") of the

4

House and Governmental Affairs Committee ("Committee") during
which 2000 Census data, redistricting guidelines, method of
securing public input, and applicable statutory and
constitutional guidelines were discussed; with assistance of
legislative staff, creation of a Draft Plan (House Bill 1), which
attempted to accommodate the above referenced considerations;
assistance by members of the Legislative staff in drafting
alternative plans that were presented and discussed at either or
both Subcommittee meetings and during the Second Extraordinary
Session, 2001; and the legislative process by which amendments to
House Bill 1 were presented, debated, and voted upon in both the
Committee and by the entire membership of the Louisiana
Legislature.

10.

On October 12, 2001, the Louisiana Legislature adopted House
Bill 1, which provided for a new single-member redistricting plan
for the 105 members of the House of Representatives and on
October 16, 2001, the Governor of the State of Louisiana, Murphy
J. Foster, signed House Bill 1 into law -- Act 3, Second
Extraordinary Session of 2001.   See Exhibit B.

**FACTUAL AND LEGAL BASIS FOR GRANT OF DECLARATORY JUDGMENT**

11.

Act 3, 2001, 2nd Ex. Sess. will not lead to a retrogression
in the position of African Americans citizens in Louisiana with
respect to the effective exercise of their electoral franchise

5

and therefore does not constitute a violation of Section 5 when compared to the appropriate benchmark, which is the electoral opportunities  provided by the last constitutional, precleared redistricting plan.

**COUNT I:** *The last constitutional redistricting plan is the 1981/1982 precleared redistricting plan (codifed as La. R.S. 24:35.2, enacted by Act 1 of the First Extraordinary Session in 1982 and Acts 11 and 49 of the 1982 regular session)(hereinafter "La. R.S. 24:35.2").   In the alternative, the "first" 1991 redistricting plan adopted by the Louisiana Legislature, Act 1, Second Extraordinary Session of 1991("Act 1, 1991, 2nd Ex. Sess."), which would have been implemented but for the July 15, 1991 Section 5 objection, which the Attorney General did not have the authority to interpose, is the appropriate benchmark. (A copy of 24:35.2 is attached as Exhibit C).*

**1991 Redistricting Process**

12.

The Governor of Louisiana convened the Legislature in an Extraordinary Session on April 8, 1991 for the purpose, inter alia, of adopting a redistricting plan for the House of Representatives, when it was determined, after the release of the 1990 Census, that the 1981/1982 redistricting plan was unconstitutionally malapportioned.  House Bill 1 was adopted on April 14, 1991, and became Act 1, Second Extraordinary Session of 1991 ("Act 1, 1991, 2nd Ex. Sess.") when signed by the Governor of Louisiana. (A copy of Act 1, Second Extraordinary Session of

6

1991 is attached as Exhibit D, accompanied by population and
demographic data).

13.

On July 15, 1991, the Attorney General interposed a Section
5 objection to the redistricting plan for the Louisiana House of
Representatives, Act 1, 1991, 2nd Ex. Sess., based upon the
failure of the Louisiana Legislature to create additional
districts in five areas of the State that would have provided to
African American persons a reasonable opportunity to elect
candidates of choice.   Retrogression was not the basis of the
Section 5 objection.   Section 5 of the Voting Rights Act confers
upon the Attorney General the authority to interpose an objection
only on retrogression grounds.  See, <u>Reno</u> v. <u>Bossier Parish</u>
<u>School Board</u>, 520 U.S. 471 (1997)("<u>Bossier</u> I"); <u>Reno</u> v. <u>Bossier</u>
<u>Parish School Board</u>, 528 U.S. 320, 145 L. Ed. 2d. 845 (2000)
("<u>Bossier</u> II").   (A copy of July 15, 1991 objection letter is
attached as Exhibit E.)

14.

As a result of the July 1991 objection, the Governor of the
State of Louisiana was forced to call another Extraordinary
Session, which began on July 28, 1991, during which the
Legislature created a second redistricting plan, Act 1, Third
Extraordinary Session of 1991)("Act 1, 1991, 3rd Ex. Sess.") that
reconfigured a number of the House of Representatives' 105
districts such that African American persons constituted a
majority of the population in four additional districts (House

7

Districts 4, 11, 21, and 72). Accordingly, racial considerations
dominated the redistricting process as to these districts, the
reconfigured boundaries for which overwhelmingly reflected the
predominance of that racial motive, i.e., the creation of four
additional African-American districts in order obtain Section 5
preclearance. See Shaw v. Reno, 509 U.S. 630 (1993)("Shaw I").
(Copies of maps and population and demographic data of Act 1, 3rd
Ex. Sess. 1991  attached as Exhibit F).

15.

The boundaries of fifty-one (51) House districts were modified
or changed in the process of creating Act 1, 1991, 3rd Ex. Sess.,
which was adopted solely in response to the Section 5 objection
and for the purpose of obtaining Section 5 preclearance and a
legally enforceable redistricting plan under which candidate
qualification, scheduled to begin September 3, 1991, for the
State's October, 1991 regular elections for the Legislature,
could be conducted.

**Benchmark and Retrogression Analysis**

16.

Section 5 provided no legal basis for the Attorney General's
July 1991 objection. House Districts 4, 11, 21, and 72 in Act 1,
1991, 3rd Sess. were significantly reconfigured -- in substantial
disregard for the State's traditional districting principles --
solely to cure the Attorney General's objection and to obtain a
precleared, legally enforceable redistricting plan in time to
conduct regularly scheduled elections for the Legislature. Act

8

1, 1991, 3rd Ex. Sess. cannot serve as the Section 5 benchmark against which retrogression will be measured. Abrams v. Johnson, 521 U.S. 74, 97 (1997).

17.

The appropriate benchmark is the last constitutional redistricting plan that was "in effect" within the meaning of Section 5, 28 C.F.R. 51.54(b)(1)(1996), -- the last constitutional plan under which elections for the State Legislature had been conducted was the 1981/1982 redistricting plan. Accordingly, the benchmark against which the electoral opportunities provided by Act 3, 2001, 2nd Ex. Sess. should be measured is La. R.S. 24:35.2 based upon current conditions, i.e., the 2000 Census. 28 C.F.R. 51.54(b)(2). See Abrams v. Johnson, 521 U.S. at 97 (1997).

18.

In the alternative, the electoral opportunities provided by Act 1, 1991, 2nd Ex. Sess. -- the first submitted 1991 redistricting plan is the appropriate benchmark, since that redistricting plan would have been implemented for House of Representative elections but for the Attorney General's July, 1991 objection, which was not permissible under Section 5.

19.

Accordingly, Act 3, 2001, 2nd Ex. Sess. does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group, since it will not lead to a

9

retrogression in the position of African Americans citizens in
Louisiana with respect to the effective exercise of their
electoral franchise as compared to either La. R.S. 24:35.2 or Act
1, 1991, 2nd Ex. Sess. and therefore does not constitute a
violation of Section 5.

**Count II**: *In the alternative, should this Court determine that
R.S. 24:35.4, enacted by Act 1, 1991, 2nd Ex. Sess. and Act 1,
1991, 3rd Ex. Sess. (hereinafter "La. R.S. 24:35.4"), is the
appropriate benchmark, the instant submitted redistricting plan
for the Louisiana House of Representatives does not lead to a
retrogression in the position of African Americans citizens in
Louisiana with respect to their effective exercise of their
electoral franchise and therefore does not constitute a violation
of Section 5.  (A copy of La. R.S. 24:35.4 is attached as Exhibit
F, with maps and population data).*

**Population and Demographic Changes**

20.

The release of the 2000 Census indicated that the population
of Louisiana had increased by 249,003 or 5.9 percent.  The
regions or areas of greatest population growth were:  north of
Lake Pontchartrain (Tangipahoa and St. Tammany parishes), with a
26.8 percent population increase and a 19.6 percent increase in
the African American population; north, south, and east of Baton
Rouge (Ascension, East Feliciana, West Feliciana, and
Livingston), with a 27.4 percent population increase and a 11.9
percent increase in the African American population; south-

10

central Louisiana (Lafayette, St. Landry, and St. Martin) with a
13.0 percent population increase and a 18.2 percent increase in
the African American population.   The regions of the greatest
population loss relative to the over-all growth rate of the State
were: East Bank of Orleans and Jefferson Parishes, with a 2.2
percent population decrease and a 7.5 percent increase in African
American population; Vernon Parish in west Louisiana, with a 15.2
population decrease and a 26.0 percent decrease in the African
American population; and the Delta parishes (East Carroll,
Madison, Tensas, Concordia Parishes), with a 1.7 percent increase
in the total population and a 5.0 percent increase in the African
American population.

21.

While the African American population increased from
1,299,138 (1990 Census) to 1,468,317 (2000 Census) and the
African American proportion of the State's population increased
from 30.8 percent to 32.9 percent, generally, this growth was
relatively equally distributed throughout the State.   According
to the 2000 Census, the average parish wide change in the African
American proportion of the population was 9.7 percent with 53
parishes experiencing an increase.   Only five of the State's 64
parishes experienced more than a five (5) percentage point gain
in the African American proportion of the population (±); only
ten (10) experienced between a two (2) to four (4) percentage
point change (±); with the remainder experiencing less than two
percentage point change (±).

11

**Benchmark and Retrogression Analysis**

22.

The release of the 2000 Census indicated that Louisiana's
existing House of Representatives' redistricting plan had a over-
all deviation of 63.4 percent; the ideal size of each of the 105
districts had increased from 40,190 (1990) to 42,561; 39
districts were significantly underpopulated and had a deviation
greater than -5 percent, of which 20 districts were African
American-majority in registration; 30 districts were
significantly overpopulated and had a deviation greater than +5
percent, of which only one district was African American majority
in registration.  Of those twenty-seven (27) districts in which
African American persons constituted a majority of the registered
voters, all but one were underpopulated as compared to the ideal
population (2000 Census) and fourteen (14) were significantly
underpopulated with a standard deviation greater than -10
percent.  (A copy of population and demographic data, as well as
deviation from ideal for La. R.S. 24:35.4, with 2000 Census, is
attached as Exhibit G).

23.

According to the 2000 Census, the existing redistricting
plan (Act 1, 1991, 2nd Ex. Sess.) included 26 districts in which
African American persons constituted the majority of the total as
well as the voting age population and 27 in which African
Americans constituted a majority of the registered voter
population.  According to the 2000 Census, in these 27 House

12

districts in which African Americans constituted a majority of
the registered voter population, 1,037,686 persons resided --
only enough people to comprise 24.4 districts of 42,561 persons
each (the ideal population for the 2001 redistricting plan) and
25.7 districts of 40,433 persons each (the least population of
which a House district can be comprised and still comply with the
one-person, one-vote requirement).  Act 3, 2001, 2nd Ex. Sess.
includes 26 districts in which African Americans constitute a
majority of the total, voting age, and registered voter
population.  See Exhibit B.

**House Districts 21 and 72**

24.

Because Section 5 and the Voting Rights Act speaks to actual
and reasonable electoral opportunities and not simply to the fact
that a minority group constitutes a majority in -- or a
particular proportion of the total population of -- a district,
Section 5 does not require the maintenance of House District 21
or 72 as black majority districts since African Americans
residing in each of those districts do not and never did enjoy a
reasonable opportunity to elect candidates of choice.  Nor could
the existing districts be modified or reconfigured in these
largely rural areas to provide reasonable opportunities to elect
candidates of choice in districts that were not racially
gerrymandered as defined and prohibited in Shaw and its progeny.
See Shaw I.

13

25.

In addition, analysis of population growth patterns over the last fifty years indicate that there is little possibility that African Americans will become sufficiently numerous and geographical compact in the future to constitute an effective majorities in either of these regions of Louisiana.

26.

For these reasons, the reduction in the African American proportion of the population in House Districts 21 and 72 will not lead to a retrogression in the position of African Americans citizens in Louisiana with respect to their effective exercise of their electoral franchise and therefore does not constitute a violation of Section 5.

**House District 11**

27.

Information that advised the creation and configuration of House District 11 was the actual population concentrations and residential patterns as indicated by the 2000 Census data, the election history of the area, and the State's traditional districting principles, as well as the information regarding communities of interest obtained from the incumbent representative and from citizen comments at the public hearing conducted on August 23, 2001 at Grambling University.   The Louisiana Legislature determined that there was an adequate factual basis from which to conclude that the three "preconditions"  necessary to prove voter dilution as set out in

14

<u>Thornburg</u> v. <u>Gingles</u>, 478 U.S. 30 (1986), were present.   <u>See</u> <u>also</u>
<u>Bush</u> v. <u>Vera</u>, 517 U.S. 952, 978-979 (1996).

28.

Accordingly, House District 11 is the product of the
Louisiana Legislature's attempt to create a district in which
African Americans in that area of the State have a reasonable
opportunity to elect candidates of choice, and which is narrowly
tailored to alleviate the vote dilution in this area and is
constitutional under <u>Shaw</u> and cases that followed interpreting
the Equal Protection Clause in the context of redistricting.
(Copies of August 23, 2001 letters from Robert Pugh, attorney to
Johnny Maxwell, indicating intent to challenge Act 3, 2001, 2nd
Ex. Sess. as violative of the Equal Protection Clause, and
Memorandum and Order in <u>Maxwell</u> v. <u>Foster</u>, (W.D. La.) C.A. No.
98-1378, dated November 24, 1999, granting Defendants' Motion for
Summary Judgment are attached as Exhibit H)

29.

Because the slight reduction in the African American
proportion of the population will not undermine in any meaningful
manner the ability of African American voters to elect a
candidate of choice, House District 11 will not result in a
retrogression in the position of African Americans citizens in
Louisiana with respect to their effective exercise of their
electoral franchise and therefore does not constitute a violation
of Section 5.

15

### *East Bank of Jefferson, Orleans, and St. Bernard Parishes*

30.

In the 1991 precleared districting plan, the East Bank of
Orleans Parish was comprised of 11 House districts wholly
included within its boundaries.  According to the 2000 Census,
African Americans constituted an effective majority of the
population in nine (9) of these districts or 81.8 percent of the
electoral opportunities of that area.  African Americans
currently represent seven (7) of those districts, but have been
elected to eight (8) of these districts during the 1990s.   In
R.S. 24:35.4, the precleared 1991 redistricting plan, the East
Bank of Jefferson Parish had seven (7) districts, none of which
had an African American majority.  Likewise, in the existing
plan, the East Bank of Orleans, Jefferson, and St. Bernard
Parishes together were divided into  20 districts, nine (9) of
which had African American-majorities (according to the 2000
Census) or 45 percent of the electoral opportunities provided to
this region bounded by the Mississippi River.

31.

According to the 2000 Census, the East Bank of Orleans
Parish had a total population of 427,892, of which African
American persons constituted 69.2 percent.  The East Bank of
Orleans Parish had only enough population to constitute ten (10)
State House seats that fully complied with the one-person, one-
vote requirement. Similarly, the East Bank of Jefferson Parish
had a total population of 257,501 people, of whom 12.3 percent

16

were African American, making it possible to divide Jefferson
Parish into only six (6) districts that complied with the one-
person, one-vote requirement.

32.

Since Act 3, 2001, 2nd Ex. Sess. provides for ten (10) total
districts located in the East Bank of Orleans Parish -- rather
than 11 -- the non-retrogression requirement of Section 5 is met
where 81.8 percent of the 10 districts (or 8 districts) comprised
an effective majority of black persons, sufficient to provide to
them a reasonable opportunity to elect candidates of choice.    In
La. R.S. 24:35.4, according to the 2000 Census, the East Bank of
Orleans, Jefferson, and St. Bernard Parishes was divided into 20
districts in nine (9) of which African American persons
constituted a majority of the population (or 45 percent).    In Act
3, 2001, 2nd Ex. Sess. this area -- the East Bank of Orleans,
Jefferson, and St. Bernard Parishes -- had sufficient population
to constitute only 18 districts.    Accordingly, the non-
retrogression requirement is met where 45 percent of these
districts provide to African American persons a reasonable
opportunity to elect candidates of choice or eight (8) districts.

33.

Compliance with the one-person, one-vote requirement and the
long held districting principle that eschewed the creation of
House districts in this area that "crossed" the Mississippi River
or Lake Pontchartrain, rendered it impossible to maintain nine
(9) districts that provided to African Americans an opportunity

17

to elect candidates of choice, although effective minority-majority populations were maintained in all districts in which African American incumbents resided and had been elected, as well as in an additional district that had elected an African American candidate in the past -- for a total of eight (8) districts that will continue to provide to African American persons an opportunity to elect candidates of choice.

34.

Act 3, 2001, 2nd Ex. Sess. should not be found to violate the non-retrogression requirement of Section 5 where the subordination of traditional districting principles in violation of the Equal Protection Clause is the only way to avoid the elimination of a district that had provided to African American voters a reasonable opportunity to elect candidates of choice, see, Miller v. Johnson, 515 U.S. 900 (1995); or where compliance with the one-person, one-vote requirement of the Fourteenth Amendment prohibits maintenance of all of the electoral opportunities provided to African Americans residing in an identifiable, historical region, area, political jurisdiction of the State; or where the maintenance of same number of effective African American districts as existed in the benchmark plan would result in significant over-representation of African American voters in a region and substantial dilution of the voting rights of the remainder of the voters in such region. See, Johnson v. DeGrandy, 512 U.S. 997 (1994).

35.

Accordingly, Act 3, 2001, 2nd Ex. Sess. which provides for eight (8) districts on the East Bank of Orleans Parish that afford to African Americans an opportunity to elect candidates of choice in this area does not violate Section 5 because African Americans in this area continue to enjoy the same proportion of electoral opportunities as were enjoyed under La. R.S. 24:35.4. This reduction in the number of African American-majority districts was largely the result of the inescapable constitutional dictate that all districts comply with the one-person, one-vote principle and the State's choice not to subordinate long held traditional districting principles that respected the distinctive communities separated by the Mississippi River and Lake Pontchartrain to race-based gerrymandering.

36.

While retrogression can be assessed statewide, as well as a regionally, Section 5 cannot be read to require the creation of an additional African-American districts in another part of State, where there is no dilution of the African-American voting strength or retrogression of electoral opportunities, to "compensate" for the "loss" of an African-American-majority districts on the East Bank of Orleans. See Shaw v. Hunt, 517 U.S. 899, 917 (1996)("Shaw II"). Just as the Court in Shaw II found that "the coordinate right to an undiluted

19

vote. . .belongs to the minority as a group and not to its individual members," id., so too the right to nonretrogression of electoral opportunities belongs to those African-Americans, who will lose electoral opportunities as a result of proposed plan and cannot be remedied -- if at all -- by the provision of additional electoral opportunities to African American citizens residing somewhere else in the State.   (Copy of Letter of Section 5 Objection for Texas House of Representatives, dated November 16, 2001, attached as Exhibit I).

37.

Indeed, due to disproportionate loss of white population on the East Bank of Orleans, almost all of the African American persons who had resided in a district that provided a reasonable opportunity to elect candidates of choice continue to reside in just such a district in the proposed plan, Act 3, 2001, 2nd Ex. Sess.   Accordingly because Section 5 rights accrue to the individual and not to the minority as a group, then there is no retrogression.

38.

For these reasons, Act 3, 2001, 2nd Ex. Sess. does not lead to a retrogression in the position of African Americans citizens in Louisiana with respect to their effective exercise of their electoral franchise and therefore does not constitute a violation of Section 5.

**COUNT III:**  *Notice of Guidance Concerning Redistricting and Retrogression Under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c; Notice, Fed. Reg. Vol. 66, No. 12, 5412 (January 18, 2001) ("Notice of Guidance") sets out the type of information and evidence that a jurisdiction could be asked to provide in order to meet its burden of demonstrating that a redistricting plan is not retrogressive.  As such, it has the potential to constitute an impermissible expansion of the scope of the Attorney General's Section 5 review when applied in an administrative preclearance proceeding.*

39.

The recently promulgated Notice of Guidance was intended to supplement the Attorney General's guidelines, and to provide "guidance" with regard to the Attorney General's analytical approach to the enforcement of Section 5."  Guidance at 5413. Specifically, the Attorney General provides guidance as to a number of topics: (1) the scope of Section 5; (2) the Section 5 benchmark; (3) how the benchmark plan is compared to the proposed plan; (4) the considerations leading to the decision to interpose any objection; (5) racially discriminatory purpose under Section 5; and (6) the use of 2000 Census data and other information during administrative Section 5 review.  Id.

40.

The Attorney General, by and through this Notice of Guidance, seeks to retain as the Section 5 benchmark any redistricting plan for which there has been no judicial

21

determination of unconstitutionality -- even those for which
there is a strong basis in evidence to conclude that the plan is
a racial gerrymander in violation of the Equal Protection Clause.
Moreover, the Guidance provides that "a jurisdiction is not
required to address the constitutionality of its benchmark plan
when submitting a redistricting plan and the question of whether
the benchmark plan is constitutional will not be "considered" by
the Attorney General in the context of Section 5 review.
Guidance at 5412.

41.

Where there has been a judicial determination of
unconstitutionality, the last precleared constitutional plan is
the appropriate Section 5 benchmark. The Attorney General's
distinction between those redistricting plans for which there has
been a judicial determination of constitutionality and those
plans -- as yet unchallenged or for which there has been no final
adjudication of the claim of unconstitutionality -- "has the
potential to freeze in place the very aspects of a plan [that
are] unconstitutional," Abrams v. Johnson, 521 U.S. at 97, when
applied to the Section 5, administrative review of redistricting
plans.

42.

The Attorney General's intention to view the Section 5
benchmark as the last precleared redistricting plan even where
there is a strong basis in evidence to conclude that the plan is
a racial gerrymander in violation of the Equal Protection Clause,

22

has the potential to require maintenance of minority-majority
districts that were created to cure a Section 5 objection that
the Attorney General did not have the authority to interpose. In
some instances, neither Section 5 nor Section 2 of the Voting
Rights Act, 42 U.S.C. 1973 ("Section 2"), provides a compelling
justification for the creation of such a race-based remedy. See
supra, Count I.

43.

The Attorney General, by and through this Notice of
Guidance, provides that where it is not clear that a
redistricting plan has a retrogressive effect, "the Department of
Justice will closely examine the process by which the plan was
adopted to ascertain whether the plan was intended to reduce
minority voting strength," and where a "jurisdiction has not
provided sufficient evidence to demonstrate that the plan was not
intended to reduce minority voting strength, either now or in the
future, the proposed redistricting plan is subject to a Section 5
objection." Guidance at 5413-5413. This provision ignores the
Supreme Court's directive in Bossier II, 528 U.S. at __, 145 L.
Ed. 2d. at 860. that "Section 5 prevents nothing but backsliding,
and preclearance under Section 5 affirms nothing but the absence
of backsliding."

44.

Whether a redistricting plan is retrogressive is a factual
determination based upon an analysis of voting patterns and
election history; the intent of the jurisdiction does not advance
this analysis. The Attorney General's guidelines provide that

where a "functional analysis does not yield clear conclusions,"
the Attorney General may interpose an objection on the grounds
that the submitting jurisdiction had not met its burden of
demonstrating the absence of a discriminatory effect.
Accordingly, it is not necessary to require the production of
this type of "intent" evidence in order for an administrative
determination to be made as to whether a jurisdiction has met its
burden of demonstrating that the redistricting plan is
retrogressive within the meaning of Section 5. See 28 C.F.R.
51.51(c).

45.

The Voting Rights Act as interpreted in Bossier II and
earlier in Beer v. United States, 415 U.S. 30 (1976), does not
provide the Attorney General with the authority to request this
type of information related to the process by which the
redistricting plan was adopted or the intent of the
decisionmakers individually or as a group, and, therefore, such
request represents an unconstitutional intrusion on the rights
and responsibilities that the Tenth Amendment of the United
States Constitution has reserved to the States.

46.

The Notice of Guidance is an unlawful expansion of the
scope of Section 5 to the extent that it would permit the
Attorney General to interpose an objection based upon the intent
of the decisionmakers, absent a determination that a change is
retrogressive. See Bossier II.

24

47.

The Procedures for the Administration of Section 5 of the
Voting Rights Act," Section 5 28 C.F.R. Part 51, are guidelines
and not regulations and therefore do not have the force of law.
See, General Electric v. Gilbert, 29 U.S. 125, 142 (1976).
Indeed, the Department of Justice offers the disclaimer that "the
analytic approach" and the types of information, documentation,
and evidence upon which the Department of Justice will rely in
its administrative review of Section 5 submissions set forth in
the Notice of Guidance are "not legally binding." Notice of
Guidance at 5412. Consequently, "an entity or jurisdiction
affected by the preclearance requirement of Section 5," id.,
cannot challenge these guidelines prior to the administrative
submission of a voting change even where the guidelines establish
a procedure or are based upon an legal interpretation that is not
permissible or is inconsistent with the Supreme Court's
interpretation of the Voting Rights Act. Had the Attorney
General enacted regulations, any jurisdiction subject to the
preclearance requirement could have challenged them in Court
prior to a submission.

48.

A jurisdiction cannot challenge the guidelines or "the
analytic approach" employed by the Attorney General after
preclearance has been denied its submission, since the
declaratory judgment proceeding before the three-judge federal
court -- the only judicial recourse available to a jurisdiction

25

-- is *de novo* and does not constitute an appeal of the Attorney General's determination.   While the Attorney General's impermissible interpretation and application of Section 5 does not deprive a jurisdiction of recourse to the courts, it does remove the ability of the jurisdiction to pursue the significantly more economical and less time-consuming alternative -- the administrative review process -- the availability of which Congress believed was important to alleviate the "substantial" federalism costs of the preclearance process. Lopez v. Monterey County 525 U.S. 266, 282 (1999).

49.

There is, therefore, no legal means by which a covered jurisdiction or entity subject to the Section 5 preclearance requirement can ensure that the Department of Justice is employing an analytic approach supported by "the relevant decisions of the Supreme Court of the United States and of other Federal courts," 28 C.F.R. 51.56, in the course of a fair submission process that does not unnecessarily burden the submitting jurisdiction or intrude upon those rights and responsibilities that are reserved to the States.

WHEREFORE, Plaintiffs respectfully request that this Court:

a)   Convene a three-judge District Court pursuant to 28
     U.S.C. 2284 and 42 U.S.C. 1973c;

b)   Enter a declaratory judgment that Act No. 3, 2001, 2nd
     Ex. Sess. does not have the purpose and will not have
     the effect of denying or abridging the right to vote on
     account of race, color, or membership in a language
     minority group;

c)   Enter a declaratory judgment that the January 2001
     Notice of Guidance results in an unlawful expansion of
     the scope of the Attorney General's Section 5 review
     authority;

d)   Grant Plaintiffs such other, further, and different
     relief as this Court may deem just and proper.

27

Respectfully submitted,


_____
Deanne E.B. Ross,
Attorney for Plaintiffs
Louisiana House of Representatives
State Capitol Building
P.O. Box 44281
Baton Rouge, LA 70804
D.C./Federal Bar #



_____
Alfred W. Speer
Clerk Louisiana House of Representatives
P.O. Box 44281
Baton Rouge, LA 70804



_____
Cinthia S. Mancuso
Executive Counsel to the Speaker
Louisiana House of Representatives
State Capitol Building
P.O. Box 94062
Baton Rouge, LA 70804