IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE LOUISIANA HOUSE OF REPRESENTATIVES;)
by and through CHARLES W. DEWITT, in   )
his official capacity as Speaker of    )
the Louisiana House of Representatives;)
and CHARLES EMILE BRUNEAU, JR., in his )  CA No. 1:02CV00062
official capacity as Speaker *Pro*     )  (JR MBG RBW)
*Tempore* of the Louisiana House of    )
Representatives,                       )
                                       )
      Plaintiffs,                  )
                                       )
          v.                    )
                                       )
JOHN ASHCROFT,in his official capacity )
as Attorney General of the United      )
States of America                      )
United States Department of Justice    )
950 Pennsylvania Avenue, N.W.          )
Washington, D.C. 20530,                )
                                       )
      Defendant.                   )
_____)


DEFENDANT'S MOTION TO DISMISS COUNT I AND COUNT III
OF PLAINTIFFS' COMPLAINT

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules

of Civil Procedure, Defendant John Ashcroft, Attorney General of

the United States, moves this Court to dismiss Counts I and III

of plaintiffs' Complaint filed January 14, 2002 in this action.

In support of this Motion, defendant submits the following

memorandum of law.  Oral argument on this Motion is requested.

TABLE OF AUTHORITIES

CASES

<u>Abrams</u> v. <u>Johnson</u>, 521 U.S. 74 (1997) . . . . . . . . . 8, 21, 22

<u>Arizonans for Official English</u> v. <u>Arizona</u>,
520 U.S. 43 (1997) . . . . . . . . . . . . . . . . . . . . . 14

<u>Bayvue Apts. Joint Venture</u> v. <u>Ocwen Fed'l Bank, FSB</u>,
971 F. Supp. 129 (D.D.C. 1997) . . . . . . . . . . . . . . . 14

<u>Beer</u> v. <u>United States</u>, 425 U.S. 130 (1976) . . . . . . . . . 8

<u>Beer</u> v. <u>United States</u>, 374 F. Supp. 357 (D.D.C. 1974) . . . . 10

<u>Burka</u> v. <u>Aetna Life Ins. Co.</u>, 56 F.3d 1509
(D.C. Cir. 1995), <u>aff'd</u>, 87 F.3d 478 (D.C. Cir. 1995) . . . . 18

<u>Busbee</u> v. <u>Smith</u>, 549 F. Supp 494 (D.D.C. 1982),
<u>aff'd</u>, 459 U.S. 1166 (1983) . . . . . . . . . . . . . . . . 17

<u>Chandler</u> v. <u>D.C. Dep't. of Corrections</u>, 145 F.3d 1355
(D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 7

<u>Chen</u> v. <u>City of Houston</u>, 9 F. Supp. 2d 745
(S.D. Texas 1998), <u>aff'd</u>, 206 F.3d 502 (5th Cir. 2000),
<u>cert. denied</u>, 532 U.S. 1046 (2001) . . . . . . . . . . . . 22

<u>City of Lockhart</u> v. <u>United States</u>, 460 U.S. 125 (1983) . . . . 9

<u>City of Rome</u> v. <u>United States</u>, 450 F. Supp. 378
(D.D.C. 1978), <u>aff'd</u>, 446 U.S. 156, <u>reh'g denied</u>,
447 U.S. 916 (1980) . . . . . . . . . . . . . . . . . . . . 25

<u>Conley</u> v. <u>Gibson</u>, 355 U.S. 41 (1957) . . . . . . . . . . . . 7

<u>Costello</u> v. <u>United States</u>, 365 U.S. 265 (1961) . . . . . . . 18

<u>County Council of Sumter County, S.C.</u> v. <u>United States</u>,
555 F. Supp. 694 (D.D.C. 1983) . . . . . . . . . . . . . . . 25

<u>Daingerfield Island Protective Society</u> v. <u>Lujan</u>,
920 F.2d 32 (D.C. Cir. 1990), <u>cert. denied</u>,
502 U.S. 809 (1991), <u>aff'd</u>, 40 F.3d 442 (1994) . . . . . . . 18

<u>District of Columbia Retirement Bd.</u> v. <u>United States</u>,
657 F. Supp. 428 (D.D.C. 1987) . . . . . . . . . . . . . . . 6

Fouts v. Harris, 88 F. Supp. 2d 1351 (S.D. Fla. 1999),
aff'd, sub nom., Chandler v. Harris, 529 U.S. 1084 (2000) . . 19

General Electric Co. v. Gilbert, 429 U.S. 125 (1976) . . . . 27

Georgia v. United States, 411 U.S. 526 (1973) . . . . . . 27, 28

Giddens v. Isbrandtsen Co., 355 F.2d 125 (4th Cir. 1966) . . 19

Gull Airborne Instruments, Inc. v. Weinberger,
694 F.2d 838 (D.C. Cir. 1982) . . . . . . . . . . . . . . . 18

Herbert v. National Academy of Sciences,
974 F.2d 192 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . 6

Hoffman v. Jeffords, 175 F. Supp. 2d 49 (D.D.C. 2001) . . . . 14

Hohri v. United States, 782 F.2d 227 (D.C. Cir. 1986),
vacated on other grounds, 482 U.S. 64 (1987) . . . . . . . . 6

Holder v. Hall, 512 U.S. 874 (1994) . . . . . . . . . . . . . 8

Kelley v. Bennett, 96 F. Supp. 2d 1301 (M.D. Ala. 2000),
vacated on standing grounds, 531 U.S. 28 (2000) . . . . . . 19

Knox v. Milwaukee County Bd. of Elections Comm'rs,
581 F. Supp. 399 (E.D. Wis. 1984) . . . . . . . . . . . . . 18

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) . . . . . 14

MacGovern v. Connolly, 637 F. Supp. 111 (D. Mass. 1986) . . . 19

Maxwell, et al. v. Foster, et al., CA No. CV98-1378M
(W.D. La., Aug. 4, 1998) . . . . . . . . . . . . 4, 15, 16, 19

Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986) . . . 27

Miller v. Johnson, 515 U.S. 900 (1995) . . . . . . . . . . . 11

National Wildlife Federation v. Burford, 835 F.2d 305
(D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . 18

Perkins v. Matthews, 400 U.S. 379 (1971) . . . . . . . . . . 10

Reno v. Bossier Parish School Board, 528 U.S. 320 (2000) . 8, 10

Reynolds v. Sims, 377 U.S. 533 (1964) . . . . . . . . . . . 15

Ryan v. Grae & Rybicki, 135 F.3d 867 (2d Cir. 1998) . . . . . 27

Sanders v. Dooly County, Georgia, 245 F.3d 1289
(11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 19

Scheuer v. Rhodes, 416 U.S. 232 (1974), overruled on other
grounds, Harlow v. Fitzgerald, 457 U.S. 800 (1982) . . . . . . 6

Shaw v. Reno, 509 U.S. 630 (1993)  . . . . . . . . . . . passim

Soileau v. Guilford of Maine, Inc., 105 F.3d 12
(1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 27

Sutton v. United Air Lines, Inc., 130 F.3d 893
(10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 27

State of Texas v. United States, 785 F. Supp. 202
(D.D.C. 1992) . . . . . . . . . . . . . . . . . . . . . . . 23

UAW-Labor Employment and Training Corporation v. Chao,
2002 WL 21720 (D.D.C. 2002) . . . . . . . . . . . . . . . . 14

United States v. Hays, 515 U.S. 737 (1995) . . . . . . . . . 15

Ward v. Ackroyd, 344 F. Supp. 1202 (D. Md. 1972) . . . . . . 18

White v. Daniel, 909 F.2d 99 (4th Cir. 1990),
cert. denied, 501 U.S. 1260 (1991) . . . . . . . . . . . . . 19

### STATUTES, REGULATIONS AND GUIDANCE

28 C.F.R. Part 51 . . . . . . . . . . . . . . . . . . . . 5, 27

28 C.F.R. 51.10 . . . . . . . . . . . . . . . . . . . . . . 16

28 C.F.R. 51.11 . . . . . . . . . . . . . . . . . . . . . . 16

28 C.F.R. 51.13(e) . . . . . . . . . . . . . . . . . . . . . 7

28 C.F.R. 51.54(a) . . . . . . . . . . . . . . . . . . . . . 8

28 C.F.R. 51.54(b) . . . . . . . . . . . . . . . . . . . . 9, 22

iii

42 U.S.C. 1973c . . . . . . . . . . . . . . . . . . . . . <u>passim</u>

Notice, 66 Fed. Reg. 5412 (Jan. 18, 2001), Guidance
Concerning Redistricting and Retrogression Under Section 5
of the Voting Rights Act, 42 U.S.C. 1973c;  . . . . . . . . 6, 13

I.  Preliminary Statement

    On January 14, 2002, plaintiffs the Louisiana House of
Representatives, Charles W. DeWitt, in his official capacity as
speaker of the Louisiana House of Representatives, and Charles
Emile Bruneau, in his official capacity as Speaker Pro Tempore of
the Louisiana House of Representatives, initiated this
declaratory judgment action under Section 5 of the Voting Rights
Act of 1965 ("Section 5"), 42 U.S.C. 1973c.  In Count II of the
complaint, they seek to have this Court "preclear" under Section
5 the redistricting plan for the Louisiana House of
Representatives adopted by the Louisiana Legislature and signed
by the Governor of Louisiana in October 2001.

    But, in Counts I and III of the complaint, plaintiffs seek
declaratory judgments beyond the basic preclearance judgment
properly sought in a Section 5 declaratory judgment action.  In
Count I, they seek to have this Court declare unconstitutional
the 1991 House plan which was adopted and precleared by the
Attorney General in 1991, and which has been in effect ever since
– the plan which is the benchmark plan for Section 5 review
purposes.  In addition, they seek to have this Court review a
Section 5 objection made by the Attorney General over ten years
ago to a Louisiana House plan initially submitted in 1991.  In
Count III, they challenge a non-binding guidance document issued
by the Department of Justice on January 18, 2001, which was

1

published to advise jurisdictions covered by Section 5 of the Department's method of analysis of redistricting plans under that statute.

Plaintiffs' claims in Count I and Count III go well beyond the purpose of a Section 5 declaratory judgment action and should be dismissed.  With respect to Count I, first and foremost, the Court does not have jurisdiction to consider the constitutional attack on the 1991 House plan set forth in Count I.  The inquiry under Section 5 is a limited one; namely, to ensure that a new voting change, such as a redistricting plan, does not have the purpose or effect of denying or abridging the right to vote on account of race, color or language minority status.  The focus of Section 5 is on the present and this Court has no jurisdiction under Section 5 to hear constitutional claims concerning a plan precleared ten years ago and in effect ever since then.  Second, even if the Court did have jurisdiction to consider the constitutional claims in Count I, plaintiffs lack the requisite standing to make such a challenge.  Third, the attacks on both the 1991 plan and the Attorney General's objection to an earlier plan are not timely.  To permit such an attack over ten years later after a new plan has been adopted and submitted would throw administration of Section 5 into chaos.  Fourth, the Supreme Court has made clear that the proper benchmark for comparison with the 2001 Louisiana House plan is the last legally

2

enforceable plan – here, Louisiana's revised 1991 plan precleared by the Department of Justice.

Count III also should be dismissed.  Plaintiffs' claims in Count III also go beyond the limited Section 5 inquiry and seek from this Court an advisory opinion on the Attorney General's January 18, 2001 Guidance memorandum and this Court does not have jurisdiction to enter such an opinion.  In any event, the Attorney General's Guidance provides a reasonable interpretation of applicable law which is non-binding on any jurisdiction and well within the scope of the Attorney General's Section 5 authority.

II. <u>Factual Background</u>

 A. <u>Louisiana's 1991 Section 5 House Redistricting Submissions</u>

 On May 14, 1991, the State of Louisiana submitted to the Attorney General for Section 5 preclearance a redistricting plan for the Louisiana House of Representatives.  After Section 5 review, the Department of Justice notified the State on July 15, 1991 of its objection to the submitted plan.  Complaint, para. 13.  Following this objection, in August 1991, Louisiana revised its proposed plan and submitted a new House redistricting plan to the Attorney General.  Again following appropriate Section 5 analysis, the Department of Justice timely notified the State that it had no objection to implementation of the second submitted Louisiana House redistricting plan.  Complaint, paras.

3

14, 15, 16.  Following this preclearance, the State began
implementation of the approved House plan, which has continued in
operation for over ten years.

On August 4, 1998, two Louisiana residents filed an Equal
Protection challenge against the precleared 1991 Louisiana House
plan in the United States District Court for the Western District
of Louisiana (Maxwell, et al. v. Foster, et al., CA No. CV98-
1378M (W.D. La.)).  The plaintiffs in this case – white residents
of Louisiana – attacked the precleared 1991 plan as
unconstitutional under the holding of Shaw v. Reno and its
progeny.  In its answer, the State pled as a First Defense the
doctrine of laches, alleging that "[t]he plaintiffs' seven year
delay in filing suit is both unreasonable and inexcusable."
Answer at 1-2 (see Exhibit 1).[1/]  In August 1999, the State filed
a Motion for Summary Judgment based on its laches defense.  On
November 24, 1999, the three-judge district court granted the
State's motion and the action was dismissed.  (See Exhibit H to
Plaintiffs' Complaint in this action.)

B.  The Attorney General's 2001 Redistricting Guidance

On January 18, 2001, the Department of Justice
published its Guidance Concerning Redistricting and Retrogression
Under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c;

---

1/ Defendant asks this Court to take judicial notice of this
pleading of the State in the Maxwell litigation.

4

Notice, 66 Fed. Reg. 5412 (January 18, 2001) (<u>See</u> Exhibit 2).  As indicated therein, in light of recent judicial decisions concerning Section 5 and the 2000 redistricting cycle, the Attorney General found it appropriate to issue guidance concerning Department of Justice review of redistricting plans submitted for Section 5 preclearance.  This was consistent with the expressed views of numerous governmental entities and interested private citizens and groups indicating that it would be helpful for the Attorney General to provide general guidance regarding the Department's analytical approach regarding Section 5 and redistricting plans in light of these recent judicial decisions.  <u>Id.</u>

The Attorney General's Procedures for the Administration of Section 5 of the Voting Rights Act, 28 C.F.R., Part 51, provides detailed information about the Section 5 review process.  The January 2001 Guidance was intended to provide general supplemental information to Section 5 jurisdictions and other interested parties regarding the operation of the Section 5 administrative review process.  As stated therein, the Section 5 Guidance places no legal requirements on any covered jurisdiction and does not carry the force of law.  Rather, "it is intended only to provide assistance to entities and persons affected by the preclearance requirements of Section 5." <u>Id.</u>

III.  <u>Argument</u>

    A.  <u>Standards For Judging a Motion to Dismiss</u>

    On a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction.  <u>District of Columbia Retirement Bd.</u> v. <u>United States</u>, 657 F. Supp. 428, 431 (D.D.C. 1987).  In evaluating whether subject-matter jurisdiction exists, the court must accept all the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor.  <u>Hohri</u> v. <u>United States</u>, 782 F.2d 227, 241 (D.C. Cir. 1986), <u>vacated on other grounds</u>, 482 U.S. 64 (1987).  Moreover, the court need not limit itself to the allegations of the complaint.  <u>Hohri</u> v. <u>United States</u>, <u>supra</u>.  Rather, the court may consider such materials outside the pleadings as it deems appropriate to determine whether it has jurisdiction in the case.  <u>Herbert</u> v. <u>National Academy of Sciences</u>, 974 F.2d 192, 197 (D.C. Cir. 1992).

    A party moving for dismissal under Federal Rule of Civil Procedure 12(b)(6) has the burden of proving that the nonmovant has failed to state a claim upon which relief can be granted.  A motion to dismiss under Rule 12(b)(6) tests not whether the plaintiff will prevail on the merits, but instead whether the plaintiff has properly stated a claim.  <u>See</u> Fed. R. Civ. Proc. 12(b)(6); <u>Scheuer</u> v. <u>Rhodes</u>, 416 U.S. 232, 236 (1974), <u>overruled on other grounds by</u>, <u>Harlow</u> v. <u>Fitzgerald</u>, 457 U.S. 800 (1982).

To prevail, the movant must show "beyond [a reasonable] doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." <u>Conley</u> v. <u>Gibson</u>, 355 U.S. 41, 45-46 (1957); <u>Chandler</u> v. <u>D.C. Dep't. of Corrections</u>, 145 F.3d 1355, 1360 (D.C. Cir. 1998).

   B. <u>The Section 5 Statutory Scheme</u>

   Under Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c, certain "covered jurisdictions" cannot implement "any voting qualification or prerequisite to voting, or standard, practice or procedure with respect to voting" without first obtaining approval, or "preclearance" of such practices from the United States Attorney General or the United States District Court for the District of Columbia.  The State of Louisiana is a covered jurisdiction subject to the terms of Section 5, and the Louisiana House redistricting plan is a voting standard, practice or procedure subject to Section 5 review.  28 C.F.R. 51.13(e).

   The inquiry under Section 5 – whether submitted administratively to the Department of Justice or, as here, in a declaratory judgment action before this Court – is a limited one: whether a jurisdiction covered by Section 5 can demonstrate that a voting change (here a redistricting plan adopted by Louisiana) "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color" or language minority group.  42 U.S.C. 1973c.  The factual

and legal analysis under this provision is also a limited one:
whether the voting change will lead to a retrogression in the
position of members of a racial or language minority group with
respect to their opportunity to exercise the electoral franchise
effectively.  Beer v. United States, 425 U.S. 130, 140-42 (1976);
see 28 C.F.R. 51.54(a).  In reviewing a redistricting plan, a
covered jurisdiction has the burden of establishing that the
proposed plan does not have the purpose or effect of worsening
the position of minority voters when compared to that
jurisdiction's "benchmark" plan.  Reno v. Bossier Parish School
Board, 528 U.S. 320, 359 (2000).  The benchmark redistricting
plan against which a new plan is compared is the last legally
enforceable redistricting plan in force for a Section 5 covered
jurisdiction.  Abrams v. Johnson, 521 U.S. 74, 96-97 (1997);
Holder v. Hall, 512 U.S. 874, 883-84 (1994); 28 C.F.R. 51.54(b).

>   C. Count I Should Be Dismissed on Jurisdictional, Standing
>      and Timeliness Grounds.  In Any Event, the 1991 Precleared
>      House Plan Is the Proper Section 5 Benchmark

Count II of plaintiffs' complaint – their request to this
Court to preclear the 2001 Louisiana House redistricting plan
adopted in October 2001 -- is properly before this Court.
However, this Court does not have jurisdiction to hear
plaintiffs' request in Count I -- that this Court review the plan
in effect for the last ten years, the benchmark plan, to

determine whether it is constitutional under the principles of Shaw v. Reno, 509 U.S. 630 (1993), and its progeny.

> 1.   This Court Lacks Subject Matter Jurisdiction Under Section 5 To Determine the Constitutionality of the 1991 Benchmark Plan

Despite the fact that Louisiana has implemented the 1991 redistricting plan approved by the Department of Justice for over ten years, plaintiffs now seek to attack their own plan as unconstitutional under the principles of Shaw v. Reno and its progeny and challenge the Department's 1991 Section 5 decision which preceded the adoption of this plan.  Because of the purported unconstitutionality of the 1991 plan, they claim that it is not the proper benchmark today for Section 5 review.  In short, they attempt to make a constitutional claim in a Section 5 declaratory judgment action.

Section 5 provides no jurisdictional basis for plaintiffs' attack on the 1991 precleared plan.  There is no authority for the proposition that a three-judge court convened in the District Court for the District of Columbia pursuant to Section 5 may adjudicate the legality of existing voting practices and procedures.  To the contrary, the Supreme Court has held on several occasions that the legality of an existing voting practice or procedure does not affect Section 5 review when a new procedure has been enacted or is about to be enforced.  See City of Lockhart v. United States, 460 U.S. 125, 132-33 (1983);

Perkins v. Matthews, 400 U.S. 379, 394 (1971).  Under Section 5, therefore, the sole issue before this Court is whether Louisiana has met its burden of demonstrating that its proposed redistricting plan "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color. . . ." 42 U.S.C. 1973c.  See Beer v. United States, 374 F. Supp. 357, 361 (D.D.C. 1974).

The Supreme Court's more recent decision in  Reno v. Bossier Parish School Board, supra, reinforces the limited nature of the Section 5 review.  There, the Supreme Court held that the intent prong of Section 5 was limited to an examination of whether the proposed plan has an intent to retrogress.  Bossier, 528 U.S. at 328-332.  The Court further held that preclearance under Section 5 does not mean that a plan is constitutional or in compliance with all laws.  It may very well be that a precleared plan may violate Section 2 of the Voting Rights Act, one-person, one-vote mandates or the legal principles set forth in Shaw, but such legal challenges are not for resolution in the Section 5 process. "We have made clear... what we reaffirm today: that proceedings to preclear apportionment schemes and proceedings to consider the constitutionality of apportionment schemes are entirely distinct."  Id. at 338.  Consistent with the limited scope of such review, Section 5 preclearance does not prejudice the ability of other parties to pursue such claims before the

10

appropriate courts.  Id. at 338-39.  See also, 42 U.S.C. 1973c

(neither administrative nor judicial preclearance under Section 5

"shall bar a subsequent action to enjoin enforcement of [change

in voting practice].")[2/]

    While the Court has no jurisdiction in a Section 5

declaratory judgment action to entertain a constitutional

challenge of the type set forth in Count I of plaintiffs'

complaint, there is no question that this Court and the

Department of Justice must be mindful of the Supreme Court's

constitutional holdings in the enforcement of Section 5.

However, as discussed below, jurisdictions can comply with both

Section 5 and the Constitution without having to ask this Court

(or the Attorney General) to determine the constitutionality of

their existing districts in a Section 5 proceeding.

    Plaintiffs appear to argue that this Court must of necessity

_____

    2/ It is clear that the legal and factual issues required to
be adjudicated in Shaw claims are distinct, complex, and
considerably broader, than the factual and legal questions
involved in this Court's Section 5 retrogression review.  The
Supreme Court made clear at the outset in Shaw v. Reno, supra,
that such claims are "analytically distinct" from other types of
voting litigation.  509 U.S. at 652.  They are Equal Protection
claims that require a plaintiff to make a threshold showing that,
in drawing a particular election district, a "legislature
subordinated traditional race-neutral districting principles...to
racial considerations."  Miller v. Johnson, 515 U.S. 900, 916
(1995).  Only if the plaintiff meets that threshold  burden will
the challenged plan be subjected to strict scrutiny, during which
the court will consider whether there was a compelling interest
for the challenged election district, and if so, whether the
challenged district was narrowly tailored to the compelling
interest.

hear jurisdictions' claims that their current plans are
unconstitutional as a prophylactic measure so that those
jurisdictions are not "locked in" (by the need to prevent
retrogression) to committing Shaw violations in their new plans.
Such an argument could have merit only if the Section 5
retrogression analysis were so inflexible that it compelled
unconstitutional district configurations.  It does not.  In the
Department of Justice Guidance Concerning Redistricting and
Retrogression Under Section 5 of the Voting Rights Act, 42 U.S.C.
1973c; Notice, 66 Fed. Reg. 5412, 5413 (January 18, 2001),[3/] it
is clearly stated that a jurisdiction is not required to violate
the constitutional one person-one vote principle, or Shaw v.
Reno, in order to prevent retrogression under Section 5.  Thus,
even if a State's benchmark plan arguably violates Shaw v. Reno,
Section 5 does not require the State to violate Shaw v. Reno in
its new plan, and there is no need to engage in a constitutional
review of the benchmark plan.

Although a retrogressive redistricting plan normally would
require the denial of Section 5 preclearance, the ultimate
decision as to whether to grant preclearance properly requires
consideration of the alternative district configurations that

---

[3/]  Other parts of this Guidance memorandum are challenged
in Count III of the complaint and are addressed in Section III D
below at pp. 23-28.  The background and purpose of this Guidance
memorandum is discussed in Section II B, supra, at pp. 4-5.

were available to the jurisdiction.  As indicated in the Attorney General's Guidance, the geographic compactness of the minority population is an important consideration in assessing whether a jurisdiction had reasonable, less-retrogressive alternative plans available to it when it redistricted.  This is significant because it is clear that the districts that have been found unconstitutional by federal courts under <u>Shaw</u> have been marked by widely dispersed minority population concentrations linked together by highly unusual district boundaries.  Except in very unusual circumstances, the United States does not understand Section 5 to require such districts to be drawn to prevent retrogression, regardless of whether they are present in the benchmark plan.  For this reason, inquiries into the constitutionality of the benchmark plan are unnecessary.

This analytical approach is set forth in detail in the Attorney General's Guidance.  It takes the principles from the <u>Shaw</u> line of cases into account in the proper Section 5 statutory context - a determination of retrogression concerning a submitted redistricting plan.   It avoids "freezing" in place districts that might violate <u>Shaw</u>, while at the same time avoiding the need for the Department of Justice or this Court to make decisions on the constitutionality of a previously precleared plan, something that Section 5 does not contemplate.

2.   <u>Plaintiffs Do Not Have Standing to Attack the
Constitutionality of the Plan Adopted and Implemented
by Louisiana in 1991</u>

Even if we assume the Court has jurisdiction to entertain

such a claim, there is a further and significant problem with the

effort in this case of the Louisiana House of Representatives to

attack the constitutionality of its 1991 plan.  The Louisiana

House does not have standing to bring such a suit.

Every claim sought to be asserted in a federal court is

subject to certain justiciability requirements arising out of

Article III, Section 2 of the Constitution.  Standing doctrine

arises from the case or controversy requirement of this provision

of the Constitution.  To establish standing, a plaintiff must

show: 1) injury in fact - a concrete and imminent violation of a

legally protectable interest; 2) causation; and 3)

redressability.  <u>Lujan</u> v. <u>Defenders of Wildlife</u>, 504 U.S. 555,

560 (1992); <u>UAW-Labor Employment and Training Corporation</u> v.

<u>Chao</u>, 2002 WL 21720, *3 (D.D.C. 2002); <u>Hoffman</u> v. <u>Jeffords</u>, 175

F. Supp. 2d 49, 54 (D.D.C. 2001); <u>Bayvue Apartments Joint Venture</u>

v. <u>Ocwen Federal Bank, FSB</u>, 971 F. Supp. 129, 131 (D.D.C. 1997).

For a claim to be viable, it must present a court with a "case or

controversy" to decide - a dispute between parties to which a

court can lend a remedy and finality.  <u>Arizonans for Official</u>

<u>English</u> v. <u>Arizona</u>, 520 U.S. 43, 64 (1997); <u>Hoffman</u>, 175 F. Supp.

at 54.

14

Here, the Louisiana House of Representatives is attempting to attack the constitutionality of its own prior actions – in essence bringing suit against itself to have a plan it drew, then implemented and finally defended in Maxwell v. Foster – declared unconstitutional.  Its constitutional rights have not been violated by its own actions.  Thus, it is clear that it does not have the requisite standing to make such a claim.  The only proper plaintiff(s) in a challenge such as plaintiffs here assert would be person(s) who claim that their individual rights as voters have been improperly violated.  United States v. Hays, 515 U.S. 737, 742-46 (1995); see also, Reynolds v. Sims, 377 U.S. 533, 561 (1964) ("A predominant consideration in determining whether a State's legislative apportionment scheme constitutes an invidious discrimination violative of rights asserted under the Equal Protection Clause is that the rights allegedly impaired are individual and personal in nature.").

    3.   Plaintiffs' Attempt to Re-examine Decisions Made
         Over Ten Years Ago is Not Timely

Plaintiffs' effort to attack both the constitutionality of the 1991 redistricting plan and the Attorney General's objection has a further defect -- it is not timely and barred by the doctrine of laches.  Indeed, it is especially puzzling to see the plaintiffs attempt to attack the 1991 plan under the principles of the Shaw line of cases.  Only a little over 2 years ago, Louisiana successfully had the very same claim in Maxwell v.

15

Foster dismissed on grounds of laches.  In that case (discussed above), Louisiana characterized a seven year delay in that challenge to its precleared 1991 plan as "inexcusable and unreasonable," yet here it apparently views its 11 year-old attack on the same plan as timely.  Plaintiffs' claim here is as "inexcusable and unreasonable" as was the Maxwell plaintiffs' claim.  By its nature, the Section 5 inquiry focuses on the present – on whether a redistricting plan proposed to go into effect in the future meets Section 5 requirements – not on the legality of prior plans or objections.   Plaintiffs' attempt to have the Court focus on the past should be rejected.

Section 5 sets up a specific procedure for covered jurisdictions to obtain preclearance of voting changes.  Preclearance can be granted only by the Department of Justice or by the United States District Court for the District of Columbia.  42 U.S.C. 1973c; 28 C.F.R. 51.10.  Where a jurisdiction disagrees with the Attorney General's decision to object to a preclearance submission, Section 5 sets out the jurisdiction's option of proceeding to the U.S. District Court for the District of Columbia for a de novo determination of the original submission.  28 C.F.R. 51.11.  This procedure has been in effect since passage of the 1965 Voting Rights Act and thus in effect in May 1991, when Louisiana submitted its first 1991 redistricting plan for the Louisiana House to the Attorney General for Section 5 review.

16

When the Attorney General objected on July 15, 1991 to this submission, the State's options under Section 5 were clear.  The State could have gone to this Court for a de novo determination of the legality under Section 5 of its disapproved plan.  On the other hand, the State could accept the Attorney General's decision and submit a revised plan for Attorney General or District Court review.  Louisiana chose not to come to this Court for review of its disapproved plan or its revised plan.  Instead, it submitted a revised House redistricting plan to the Attorney General, which, as indicated above, was reviewed and precleared.  That plan has now been in effect for over ten years without interruption.  The State's apparent regret over its 1991 decision not to challenge the objection comes too late.  The State's 1991 plan properly has gone through the preclearance procedure established by Congress and this Court cannot and should not now revisit a preclearance decision properly made ten years ago.[4]

The equitable doctrine of laches imposes on the defendant the ultimate burden of proving "(1) lack of diligence by the

---

[4] Plaintiffs' apparent challenge in Count I to the Attorney General's 1991 objection to Louisiana's first submitted House plan as outside the scope of Section 5 also is without merit. While there have been important developments in Section 5 law between 1991 and the present, that does not mean, plaintiffs' conclusory allegations to the contrary notwithstanding, that the Department of Justice acted in a manner inconsistent with established legal precedent at the time the objection was entered in 1991.  See Busbee v. Smith, 549 F. Supp 494 (D.D.C. 1982), aff'd, 459 U.S. 1166 (1983).

party against whom the defense is asserted, and (2) prejudice to
the party asserting the defense." Costello v. United States, 365
U.S. 265, 282 (1961). See Burka v. Aetna Life Ins. Co., 56 F.3d
1509, 1514 (D.C. Cir. 1995), aff'd, 87 F.3d 478 (D.C. Cir. 1995);
Gull Airborne Instruments, Inc. v. Weinberger, 694 F.2d 838, 843
(D.C. Cir. 1982). The first element of laches--lack of
diligence--exists where the plaintiff delayed inexcusably or
unreasonably in filing suit. Daingerfield Island Protective
Society v. Lujan, 920 F.2d 32, 37 (D.C. Cir. 1990), cert. denied,
502 U.S. 809 (1991), aff'd, 40 F.3d 442 (1994); National Wildlife
Federation v. Burford, 835 F.2d 305, 318 (D.C. Cir. 1987). An
inexcusable or unreasonable delay may occur only after the
plaintiff discovers or with reasonable diligence could have
discovered the facts giving rise to his cause of action. Knox v.
Milwaukee County Bd. of Elections Comm'rs, 581 F. Supp. 399, 402
(E.D. Wis. 1984); Ward v. Ackroyd, 344 F. Supp. 1202, 1212 (D.
Md. 1972). The second element – prejudice to the defendant – is
demonstrated by a disadvantage on the part of the defendant in
asserting or establishing a claimed right or some other harm
caused by detrimental reliance on the plaintiff's conduct. Gull
Airborne, 694 F.2d at 844. However, the defendant "is aided by
the inference of prejudice warranted by the plaintiff's delay.
The plaintiff is then to be heard to excuse his apparent
laggardness and to prove facts manifesting an absence of actual

18

prejudice." <u>Giddens</u> v. <u>Isbrandtsen Co.</u>, 355 F.2d 125, 128 (4th Cir. 1966).  Of importance, laches has been applied to bar actions challenging redistricting plans.  <u>See</u> <u>White</u> v. <u>Daniel</u>, 909 F.2d 99 (4th Cir. 1990), <u>cert.</u> <u>denied</u>, 501 U.S. 1260 (1991); <u>Fouts</u> v. <u>Harris</u>, 88 F. Supp. 2d 1351, 1353 (S.D. Fla. 1999), <u>aff'd</u>, <u>sub nom.</u>, <u>Chandler</u> v. <u>Harris</u>, 529 U.S. 1084 (2000); <u>MacGovern</u> v. <u>Connolly</u>, 637 F. Supp. 111 (D. Mass. 1986).  <u>But see</u> <u>Sanders</u> v. <u>Dooly County, Georgia</u>, 245 F.3d 1289 (11th Cir. 2001); <u>Kelley</u> v. <u>Bennett</u>, 96 F. Supp. 2d 1301 (M.D. Ala. 2000), <u>vacated on standing grounds</u>, 531 U.S. 28 (2000).

The elements necessary for a finding of laches clearly are present here.  In <u>Maxwell</u>, Plaintiffs have already characterized a <u>Shaw</u> claim filed in 1999 against their 1991 precleared plan as inexcusably delayed.  Their claim to the same effect in this action is even more so.  As indicated immediately above, Louisiana has had many options open to it, both before and after the 1993 decision in <u>Shaw</u>, to attempt to rectify any perceived problems with the Attorney General's 1991 objection or the State's 1991 precleared plan.  It has chosen not to do so until now, over 10 years after the Attorney General's 1991 Section 5 objection and then preclearance, and over 8 years since the decision in <u>Shaw</u>.  Its lack of diligence in pursuing its claim should not be condoned by this Court.

Moreover, there is severe prejudice which will occur if

plaintiffs' claim is allowed to proceed at this late date.  The logical consequences of acceptance of plaintiffs' Count I argument undoubtedly would be extremely detrimental, if not disastrous, to the proper enforcement of Section 5.  If a covered jurisdiction is able to secure continual review of Section 5 decisions made long ago, there will be no finality to Section 5 decisions made either by the Attorney General or this Court.  Under plaintiffs' argued scenario, a jurisdiction always would be able to challenge a previous preclearance decision based on a claim of the illegality of the precleared change, even though such change has not been found illegal by any court.

This scenario has the potential to clog both the Department of Justice and this Court with countless additional preclearance exercises never envisioned by Congress.  To deal with such situations, both the Department and this Court would be required in each case to conduct analysis of, or try, at least two voting changes, one of which likely would be years old.  As an example, in this action, litigation of Count I would require not only a detailed retrogression analysis and litigation of the proposed 2001 plan for the Louisiana House, but also trial of the claim that the 1991 plan is unconstitutional.  Additional litigation might ensue over other prior plans alleged to be improper benchmarks.  Section 5 enforcement could be brought to a standstill if the challenge set forth in Count I is permitted to

be heard.  In light of the above, plaintiffs' claim is barred by laches and should be dismissed.

    4.   <u>The 1991 Precleared Plan is the Proper Benchmark</u>

    The proper benchmark for this Court to consider in determining whether the 2001 Louisiana House redistricting plan is retrogressive under Section 5 is the 1991 plan which was precleared by the Department of Justice in 1991, and which has been in effect ever since.  As indicated above, in the context of redistricting, the benchmark plan against which a new plan is compared is the last legally enforceable redistricting plan in force for a Section 5 covered jurisdiction.  <u>See</u> 28 C.F.R. 51.54(b).

    Plaintiffs cite <u>Abrams</u> v. <u>Johnson</u>, 521 U.S. 74 (1997), for the proposition that the precleared 1991 plan cannot be the benchmark because of its alleged unconstitutionality under <u>Shaw</u>. But <u>Abrams</u> addressed the question of the proper Section 5 benchmark in a totally different posture than that present here. In <u>Abrams</u>, a three-judge federal district court in Georgia sustained a constitutional challenge under <u>Shaw</u> to two Congressional districts.  The district court drew and ordered into effect a new redistricting plan to remedy the constitutional violations it had found.  On appeal, the district court's remedial plan was challenged on the grounds that it was retrogressive under Section 5.  The Supreme Court held that in

formulating its remedial plan, the district court correctly avoided retrogression in minority voting strength by measuring its own plan against the State's [1982] redistricting plan, rather than the plan that the court had already found to be unconstitutional.  Thus, <u>Abrams</u> indicates only that a Court <u>finding</u> of unconstitutionality of a redistricting plan under <u>Shaw</u> prevents that plan from serving as a benchmark for Section 5 purposes.  ("Section 5 cannot be used to freeze in place the very aspects of a plan <u>found</u> unconstitutional."  <u>Abrams</u>, 521 U.S. at 97 (emphasis added)).

In <u>Chen</u> v. <u>City of Houston</u>, 9 F. Supp. 2d 745 (S.D. Texas 1998), <u>aff'd</u>, 206 F.3d 502 (5th Cir. 2000), <u>cert. denied</u>, 532 U.S. 1046 (2001), the court dealt with an argument almost identical to plaintiffs' claim here.  In that case, Houston residents, among other things, raised a <u>Shaw</u> challenge to the City of Houston's city council redistricting plan.  At the time of the development of the challenged plan, the City's existing plan was a 1995 plan which had been precleared by the Department of Justice and was then in effect.  The <u>Chen</u> plaintiffs argued that the precleared plan was constitutionally defective and thus not a proper benchmark.  Citing to <u>Abrams</u>, the district court disagreed, stating that "it is uncontroverted that the 1995 [DOJ] plan has not been held unconstitutional and, as a result, it is the proper benchmark."  <u>Chen</u>, 9 F. Supp. 2d at 757 n. 12.  <u>See</u>

22

<u>also</u>, <u>State of Texas</u> v. <u>United States</u>, 785 F. Supp. 202, 205 (D.D.C. 1992) (plan deemed the proper benchmark for Section 5 preclearance purposes "[u]nless and until it is held to be unconstitutional or otherwise invalid under Section 2 of the Voting Rights Act.")

There has been no finding that the 1991 precleared Louisiana House redistricting plan is unconstitutional.  That plan is the last legally enforceable redistricting plan for the Louisiana House.  It is the plan in effect now and the proper benchmark for this Court to consider in determining Section 5 retrogression as the State has requested.

> D.  <u>The Attack on the Attorney General's Guidance in Count III Should Be Dismissed Because This Court Does Not Have Jurisdiction to Consider This Claim and Because Defendants Do Not Have Standing to Bring It.  In Any Event Issuance of the Guidance is Within the Scope of the Attorney General's Section 5 Authority</u>

Plaintiffs continue their Count I attack on the Attorney General's Section 5 legal analysis in Count III of their Complaint, asking this Court to declare that the Attorney General's January 2001 Notice of Guidance results in an unlawful expansion of the Attorney General's review authority under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c.  Count III also should be dismissed.

1.  <u>The Court Does Not Have Jurisdiction in a Section 5
Declaratory Judgment to Consider the Authority of the
Attorney General to Issue Section 5 Guidance Nor Do the
Plaintiffs Have Standing to Attack the Guidance</u>

As set forth above, the Section 5 inquiry for this Court is
a limited one -- whether Louisiana has met its burden of
demonstrating that its new redistricting plan "does not have the
purpose and will not have the effect of denying or abridging the
right to vote on account of race or color. . . ." 42 U.S.C.
1973c.  This Court does not have jurisdiction to issue an
advisory opinion in a Section 5 declaratory judgment action to
consider an independent attack on nonbinding Guidance promulgated
by the Attorney General.

If a Section 5 covered jurisdiction disagrees with all or
part of the analytical approach espoused in the Guidance, it is
free to follow its own views as to the proper Section 5 analysis
in preparing and making its submission for preclearance to the
Department of Justice.  If a jurisdiction subsequently disagrees
with an objection made by the Department which it believes is
based on an erroneous interpretation of Section 5 law, it can
proceed to a <u>de</u> <u>novo</u> proceeding in the United States District
Court for the District of Columbia.  Indeed, even at the outset
of the Section 5 process, a jurisdiction is free to bypass the
Department of Justice's administrative Section 5 process
altogether and file a declaratory judgment action in that Court
– as the plaintiffs have in this proceeding.

24

The bottom line is that, under any scenario where a covered jurisdiction disagrees with the Attorney General's legal analysis concerning a Section 5 submission, Section 5 has always provided the jurisdiction with the option to have the District of Columbia Court review the matter de novo and make its decision on a disputed legal issue.  In such an action, the Court will be the final arbiter of the appropriate legal standards to be applied to a particular Section 5 submission.  That is the procedure set up by Congress under Section 5 and the option open to all participants in the Section 5 process.  But, this process does not contemplate an independent advisory inquiry and opinion by the Court outside the confines of an actual submission.

Implicit in plaintiffs' claim is that one form of preclearance is superior to the other.  Clearly that is not the case.  While the Department of Justice Section 5 administrative procedure is generally viewed as more efficient and less time-consuming, this Court has regarded both the judicial and administrative preclearance process as "co-equal" Section 5 procedures, leaving it to the will and discretion of covered jurisdictions to determine which process is preferable.  City of Rome v. United States, 450 F. Supp. 378, 382 (D.D.C. 1978), aff'd, 446 U.S. 156, reh'g denied, 447 U.S. 916 (1980).  See also, County Council of Sumter County, S.C. v. United States, 555 F. Supp. 694, 706 (D.D.C. 1983).  ("[T]his Court's role under

25

Section 5 of the Act is to examine the [voting] change de novo as an alternative to the Attorney General's decision regarding preclearance.").

Thus, the Guidance does not require plaintiffs to do anything different now under Section 5 than before its issuance. It does not force them to subject themselves to an inferior process for Section 5 preclearance purposes.  It does not force them to surrender to an allegedly improper legal analysis. Rather, jurisdictions continue to have the option to come to this Court for an initial Section 5 determination or where they disagree with a Section 5 objection made by the Attorney General. This Court still remains, subject to a jurisdiction's choosing, the ultimate decisionmaker with regard to preclearance under Section 5.  In short, Plaintiffs lack standing to mount their Count III challenge.  They suffer no injury by virtue of the existence of the Guidance, and thus there is no case or controversy for this Court to decide.

> 2.   The Attorney General Has Authority to Issue Non-
>      Binding Guidance

In any event, Section 5 provides ample authority for the Attorney General's issuance of the Guidance.  The Guidance memorandum sets out the Attorney General's understanding of the state of the law and his informational or interpretive perspective on Section 5 standards and is not adopted as part of the notice and comment rulemaking process.  The Guidance lacks

26

any binding legal effect and does not carry the force of law.[5/]
As such, the publication of such Guidance is well within the
scope of his Section 5 authority and is a reasonable attempt to
set forth non-binding guidance for Section 5 jurisdictions to
follow in light of recent Supreme Court decisions affecting
redistricting.

In Georgia v. United States, 411 U.S. 526 (1973), the
Supreme Court made clear that the Attorney General has authority
to issue such guidance.  That action was commenced by the United
States under the Voting Rights Act to enjoin state elections
under a state legislative reapportionment plan which had not been
precleared under Section 5.  During litigation, Georgia
challenged the Attorney General's detailed Section 5
administrative guidelines, found at 28 C.F.R. Part 51, as
generally outside the scope of the Attorney General's Section 5
authority and specifically challenged that part of the
regulations which address the time frame in which the Attorney
General must respond to Section 5 submissions and set forth the
standard for the burden of proof in such proceedings.  The Court

_____

[5/] It is well settled that Guidance published pursuant to an
agency's administrative discretion is not binding.  See, e.g.,
Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)
(guidelines represent a body of experience but are "not
controlling on the courts by reason of their authority");
General Electric Co. v. Gilbert, 429 U.S. 125, 141 (1976); Ryan
v. Grae & Rybicki, 135 F.3d 867 (2d Cir. 1998); Sutton v. United
Air Lines, Inc., 130 F.3d 893 (10th Cir. 1997);  Soileau v.
Guilford of Maine, Inc., 105 F.3d 12, 14 n.3 (1st Cir. 1997).

found that, while Section 5 had not specifically authorized the Attorney General to issue regulations, his choice to "formulate and publish objective ground rules" for the administration of Section 5 clearly was permissible if the guidelines are "reasonable and do not conflict with the Voting Rights Act itself."  411 U.S. at 536.

Here, in publishing the January 18, 2001 Guidance memorandum, the Attorney General is providing "objective ground rules" to Section 5 jurisdictions in light of recent court decisions relevant to the review of redistricting submissions which are "reasonable and do not conflict" with relevant law. While his decision with regard to the Section 5 analytical scheme may not be the "only choice" available, as was the case in Georgia, it is a reasonable one consistent with Section 5.  It is well within the scope of authority the Attorney General enjoys under Section 5.

V.  <u>Conclusion</u>

For the reasons set forth above, Count I and Count III of plaintiffs' Complaint in this action should be dismissed.


Respectfully submitted,


ROSCOE C. HOWARD, JR.    RALPH F. BOYD, JR.
United States Attorney   Assistant Attorney General


_____
JOSEPH D. RICH (D.C. Bar No. 463885)
Chief
BRIAN F. HEFFERNAN (VA Bar No. 17197)
KRISTEN M. CLARKE (NY Bar)
Attorneys
Voting Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
(202) 514-4755 (telephone)
(202) 307-3961 (fax)

29