```
             IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
```

THE LOUISIANA HOUSE OF REPRESENTATIVES;)
by and through CHARLES W. DEWITT, in    )
his official capacity as Speaker of     )
the Louisiana House of Representatives;)
and CHARLES EMILE BRUNEAU, JR., in his ) CA No. 1:02CV00062
official capacity as Speaker *Pro*      ) (JR MBG RBW)
*Tempore* of the Louisiana House of     )
Representatives,                        )
                                        )
          Plaintiffs,                   )
                                        )
               v.                       )
                                        )
JOHN ASHCROFT, in his official capacity )
as Attorney General of the United       )
States of America,                      )
                                        )
          Defendant.                    )
                                        )

## DEFENDANT'S REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS COUNT I AND COUNT III OF THE COMPLAINT

Defendant John Ashcroft submits the following reply brief in support of his Motion to Dismiss Count I and Count III of the Complaint in this action, filed March 14, 2002.[1]

---

[1] As indicated in Defendant's Motion to Dismiss at pp. 6-7, for purposes of a motion to dismiss, plaintiffs' factual assertions in the Complaint are taken as true. However, this standard does not give plaintiffs license to insert a plethora of other unsupported facts into their response to a motion to dismiss that must also be taken as accurate. Plaintiffs have done so here in various parts of their Response (dealing with, among other things, such matters as alleged actions and motivation of members of the Louisiana Legislative Black Caucus and actions and internal deliberations of the Department of Justice). While defendant does not believe that such allegations not found in the Complaint have an impact on its arguments here, defendant nevertheless does not concede the accuracy of any such statements for purposes of its motion. In particular, defendant contests plaintiffs' statement on page 4 of their Response that "[t]here is no dispute that the Attorney General was without

I.  <u>Plaintiffs' Argument To The Contrary Notwithstanding, Count I Of The Complaint Is A **Shaw** Attack On The State's Own Plan Which This Court Does Not Have Jurisdiction To Consider And Plaintiffs Do Not Have Standing To Bring</u>

Forced to acknowledge, in their Response in opposition to Defendant's Motion to Dismiss ("Response"), that they have no standing to mount a <u>Shaw</u> attack on their own redistricting plan, plaintiffs attempt to portray their legal challenge in Count I as something that it is not. But plaintiffs cannot escape the conclusion that, at bottom, they are asking this Court to rule the current benchmark Louisiana House redistricting plan invalid under the principles of <u>Shaw</u> and its progeny. As set forth in Defendant's Motion to Dismiss, this Court does not have jurisdiction to hear such a challenge and plaintiffs do not have standing to raise it.

Plaintiffs allege that their claim in Count I is simply that a redistricting plan that is the "product" of an improper Section 5 objection on the part of the Attorney General cannot serve as the benchmark in a Section 5 declaratory judgment proceeding. But plaintiffs' Complaint and argument in their Response speak

---

authority under the Voting Rights Act to interpose an objection to [Louisiana's first submitted 1991 House redistricting plan] for failure to provide for additional electoral opportunities for African Americans and that the existing plan [the 1991 precleared plan] would not have been created but for the Attorney general's impermissible objection and unlawful 'maximization' policy." While such an assertion, to the extent it is included in plaintiffs' Complaint, must be taken as true for purposes of Defendant's Motion to Dismiss, it is not "undisputed" for other purposes as plaintiffs appear to claim.

otherwise and it is clear that the real target of their challenge and argument is the 1991 precleared benchmark plan and its alleged unconstitutionality.  Thus, with regard to the 1991 precleared plan, plaintiffs' Complaint (Para. 14) alleges that "racial considerations dominated the redistricting process" and that "reconfigured boundaries overwhelmingly reflected the predominance of that racial motive," and otherwise makes clear that plaintiffs' claim against the benchmark status of the precleared plan is because of the State's alleged unconstitutional use of race.  Similarly, in their Response at pp. 9-10, plaintiffs assert that "racial considerations dominated the redistricting process" and that "race was the predominate motive in the reconfiguration of all of these districts" in the precleared plan.[2]/  Very clearly, plaintiffs are attacking the constitutionality of their plan under <u>Shaw</u> and, for the reasons set forth in Defendant's Motion to Dismiss, this Court does not have jurisdiction to consider this claim.

II.   <u>The 1991 Precleared House Plan Is The Proper Benchmark</u>

Despite the above-cited statements of plaintiffs and that Count I is directed specifically at having the 1991 precleared plan stripped of its benchmark status because of its alleged

---

[2]/ In a further attempt to give a racial taint to the precleared plan, the plaintiffs allege in their Response at page 4 that the Department of Justice directed the redistricting process through the Louisiana Legislative Black Caucus.

unconstitutionality under <u>Shaw</u>, plaintiffs assert that their dispute in Count I is only with the Attorney General's objection which "produced" the precleared plan.  But, even if plaintiffs are not challenging the 1991 precleared plan as unconstitutional, this argument does not lead plaintiffs to the result they desire - invalidation of the existing benchmark.

If plaintiffs' Count I attack is solely on the Attorney General's 1991 objection, it must fail because that objection is not subject to judicial review.  <u>Morris</u> v. <u>Gressette</u>, 432 U.S. 491 (1977); <u>City of Rome</u> v. <u>U.S.</u> 450 F. Supp 378, 381 fn. 2 (D.D.C. 1980), <u>aff'd.</u> 446 U.S. 156 (1980)(rejecting constitutional challenge to Attorney General's Section 5 objection as beyond scope of Section 5 authority.  "It is of no consequence in assessing this Court's jurisdiction over the instant challenge whether the challenge is couched in terms of improper procedures or in terms of improper results.")

In any event, there is simply no authority, and plaintiffs point to none, for the remarkable proposition that a plan can be stripped of its benchmark status simply by virtue of alleged deficiencies in the Attorney General's ten-year old Section 5 analysis of a separate previously submitted plan.[3/]  Caselaw

---

[3/] As set forth in Defendant's Motion to Dismiss at pp. 16-17, Louisiana had several options since 1991 under the clear statutory procedure of Section 5 if it was not satisfied with the Attorney General's 1991 objection to its first House redistricting plan or if it subsequently had concerns about the

which plaintiffs continue to ignore makes it clear that a benchmark plan will lose such status only upon a finding of unconstitutionality and nothing less.

As set forth in defendant's Motion to Dismiss (p. 8), the law is clear that the benchmark redistricting plan against which a new plan is compared is the last legally enforceable redistricting plan in force for a Section 5 covered jurisdiction. Abrams v. Johnson, 521 U.S. 74, 96-97 (1997); Holder v. Hall, 512 U.S. 874, 883-84 (1994); 28 C.F.R. 51.54(b).  Moreover, plaintiffs' continuing reliance on Abrams v. Johnson, supra, for the proposition that the precleared 1991 plan cannot be the benchmark because of its alleged unconstitutionality under Shaw, is wrong.  Abrams indicates only that a Court finding of unconstitutionality of a redistricting plan under Shaw prevents

---

viability under Shaw of its precleared plan.  See also Morris v. Gressette, supra, 432 U.S. at 507 fn. 21; City of Rome, supra, 450 F. Supp. at 381-82.  Plaintiffs try to brush off these arguments in a cursory fashion in their Response, referring to ambiguous "political and fiscal" and other considerations which supposedly excuse their failure to act in the past 11 years. More seriously, however, plaintiffs do not even respond to defendant's laches argument at pp. 15-21 of Defendant's Motion, arguing that under the Federal Rules of Civil Procedure, they do not have to do so in response to a Motion to Dismiss.  But that is not the law in this Circuit, where it is proper to raise an affirmative defense by pre-answer motion to dismiss under FRCP 12(b)(6). Smith-Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998); Mittleman v. United States, 997 F. Supp. 1, 6 (D.D.C. 1998).  Thus, plaintiffs have not even addressed one of defendant's claims for dismissal.  Defendant submits, for the reasons set forth in his Motion to Dismiss, that laches bars plaintiffs' Count I claim.

that plan from serving as a benchmark for Section 5 purposes. Motion at 21-22. This holding of <u>Abrams</u> was reinforced very recently by the decision of a three-judge court in South Carolina in <u>Colleton County Council, et al.</u> v. <u>McConnell, et al.</u>, C.A. No. 01-3581-10 (D.S.C. March 20, 2002).[4]

In <u>Colleton County</u>, a three-judge court was empaneled to devise redistricting plans for the South Carolina State House, Senate and United States Congressional districts after the State was unable to enact those plans. In a detailed opinion, the court discusses the plans it has formulated and as part of its analysis discusses the interplay of the commands of "one-person, one-vote," Sections 2 and 5 of the Voting Rights Act of 1965, and the Equal Protection Clause as set forth in <u>Shaw</u> v. <u>Reno</u> and its progeny.[5]

The court's well-reasoned discussion of the proper Section 5 benchmark is on point and consistent with defendant's argument in its Motion to Dismiss in this case. Initially, the court states

---

[4] This decision was lodged with the Court by defendant on March 21, 2002 and served on plaintiffs both electronically, by electronic court filing, and by overnight courier. Nevertheless, plaintiffs do not even acknowledge its existence in the entirety of their 45 page response to Defendant's Motion to Dismiss.

[5] Because the Court was drawing its own plans, as opposed to approving plans devised by the legislature, such plans were not subject to the preclearance requirements of Section 5. However, the Court correctly recognized, citing to <u>Abrams</u>, that it "must still 'follow the appropriate Section 5 standards, including the body of administrative and judicial precedents developed in Section 5 cases'." Opinion at 35.

that "the benchmark plan for purposes of measuring retrogression is the last 'legally enforceable' plan used in the jurisdiction." (Citations omitted) In response to an argument raised by the Governor of South Carolina (a party), the court then addressed a "potential [Shaw] problem" arising out of the alleged "use of racial gerrymandering during the 1990's round of redistricting to maximize black representation." Opinion p. 54. In this regard, the court states:

> In Abrams, however, the Supreme Court reiterated that the last legally enforceable plan used by the jurisdiction is to serve as the baseline for comparison in a Section 5 retrogression analysis. See Abrams, 521 U.S. at 96-97; see also Bossier Parish II, 528 U.S. at 334 (noting that 'in Section 5 preclearance proceedings – which uniquely deal only and specifically with changes in voting procedures – the baseline is the status quo that is proposed to be changed: If the change abridges the right to vote relative to the status quo, preclearance is denied, and the status quo (however discriminatory it may be) remains in effect...; Holder, 512 U.S. at 883-84 ("The baseline for comparison is present by definition; it is the existing status. While there may be difficulty in determining whether a proposed change would cause retrogression, there is little difficulty in discerning the two voting practices to compare to determine whether retrogression would occur."); Smith, 946 F. Supp at 1209 (noting that "any benchmark...should be the last plan that was legally adopted by the General Assembly that has not been set aside by the court or superseded by action of the General Assembly that has not been altered by the court.").

Opinion at 54-55.

Finally, the court cites to the January 2001 Department of Justice Guidance on redistricting (discussed at length in Defendant's Motion to Dismiss), which takes the position "that an

- 7 -

actual 'finding of unconstitutionality under Shaw' would be a prerequisite to rejecting the last legally enforceable plan as the benchmark." Opinion at 55.  In light of the above, the court holds that, "so long as a current district or plan has not been formally declared to be the product of an unconstitutional racial gerrymander under the principles of Shaw and its progeny, it will serve as the benchmark for measuring retrogression." Id.  The court also recognizes, as noted in Defendants's Motion (p. 11, fn. 2 and p. 20), that a Shaw inquiry is a fact-intensive inquiry which, (even on a local court level), could embroil the court unnecessarily in "extended mini-trials" to determine possible Shaw infirmity.

Of further significance, the court in Colleton County, consistent with defendant's position in its Motion to Dismiss, recognizes that, in making a Section 5 retrogression determination, the Court must be mindful of the Supreme Court's constitutional holdings in the enforcement of Section 5.  The decision further supports defendant's argument that jurisdictions can comply with both Section 5 and the Constitution without having to ask this Court (or the Attorney General) to determine the constitutionality of their existing districts in a Section 5 proceeding.  As the Colleton County court states:

> This conclusion [regarding the benchmark] does not, however, equate to a requirement that we must accept the configuration of the existing districts.  The benchmark has no direct effect upon the constraints we

- 8 -

> now know to be imposed by the Equal Protection Clause.
> The fact that a suspect district has not been formally
> declared unconstitutional does not affect our duty to
> draw districts in accordance with the goals of the
> Voting Rights Act and the principles enunciated by the
> Supreme Court in Shaw and its progeny.  Those
> principles operate in tandem to require us to "clean
> up" cores of existing majority-minority districts
> should the application of federal law and traditional
> state districting principles now dictate a somewhat
> different configuration.  If, in fact, the prior
> district was gerrymandered to achieve an unnecessarily
> – and indeed unconstitutionally – high percentage of
> black voting age population, the constraints of our
> current remedial factors will necessarily bring that
> percentage down to a more acceptable and reasonable
> level.

Opinion at 56-57.  The opinion then again cites with approval the Department's Guidance concerning the method for measuring and evaluating retrogression in the 2000 redistricting process.  Id.

   The decision of the three-judge court in Colleton County lends great force to the defendant's position concerning the proper benchmark in this case and the proper method for evaluating possible retrogression in the 2001 Louisiana House redistricting plan.  The proper benchmark is the 1991 plan precleared by the Department of Justice and any concern on plaintiffs' part about the Attorney General's 1991 objection should have been raised long ago.  Plaintiffs continue to want to focus on the past when the focus of Section 5 is on the present and the legality under Section 5 of new voting changes.  For the reasons stated above and in Defendant's Motion, defendant submits that this Court can focus properly on the present while paying

heed to the Supreme Court's rulings in this complicated area. Count I should be dismissed.[6]

### III. The Attorney General's Guidance is a Reasonable Exercise of His Authority to Administer and Interpret Section 5

Plaintiffs' Response confuses what they are claiming in Count III of their Complaint. On its face, Count III appears to attack only the Attorney General's January 18, 2001 Guidance, and in fact plaintiffs' prayer for relief (Complaint, p. 27, Para. c)) is directed solely at that Guidance. However, plaintiffs' Response indicates that they "challenge a number of provisions of Defendant's Section 5 guidelines [presumably the Procedures for the Administration of Section 5 of the Voting Rights Act, as amended, 28 C.F.R. Part 51] and Notice of Guidance", Response at 40, and later, plaintiffs assert that they "do not, however,

---

[6] Without argument, plaintiffs suggest on page 7 of their Response that defendant has not complied with the Federal Rules of Civil Procedure (FRCP) by not filing an answer to plaintiffs' Complaint within the required time. This is not true. Pursuant to Rule 12(a)(4) FRCP, the filing of a motion to dismiss under Rule 12 tolls the time for filing of an answer, if necessary, until 10 days after the court's ruling on the motion. In addition, the overwhelming weight of authority is to the effect that, where a motion to dismiss is directed at some but not all counts of a complaint, filing of an answer to the unchallenged claims in the complaint is also tolled until 10 days after the court's decision on the motion. See, e.g., Tingley Systems, Inc. v. CSC Consulting, 152 F. Supp. 2d 95, 122 (D. Mass. 2001); Clark v. Commercial State Bank, 2001 WL 685529, *1 (W.D. Texas 2001); Finnegan v. University of Rochester Medical Center, 180 F.R.D. 247, 249-50 (W.D.N.Y. 1998); Oil Express National, Inc. v. D'Alessandro, 1997 WL 160753, *1-2 (N.D. Ill. 1997); 5A Wright and Miller, Federal Practice and Procedure, Section 1346 (2000). But see, Gerlach v. Michigan Bell Telephone Company, 448 F. Supp. 1168 (E.D. Mich. 1978).

oppose Defendant's motion to the extent that this Court interprets Count III as a challenge to the guidelines and the Notice of Guidance."  Response at 43.

Nevertheless, both the Guidance and "guidelines" are a reasonable exercise of the Attorney General's authority under Section 5.  Plaintiffs contend that both the Attorney General's Guidance and Section 5 guidelines should be accorded no deference by this Court because "they do not accurately represent legislative policy decisions as interpreted by the Supreme Court".  Response at 41.  With regard to the Section 5 guidelines, a claim similar to that of plaintiffs has already been the subject of the Supreme Court decision in <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973).  As discussed at pp. 27-28 of Defendant's Motion to Dismiss, <u>Georgia</u> involved a challenge to the Attorney General's detailed Section 5 administrative guidelines, 28 C.F.R. Part 51, as beyond the scope of the Attorney General's Section 5 authority.  The Court held that "[r]ather than reading the statute to grant him unfettered discretion as to procedures, standards and administration in this sensitive area, the Attorney General has chosen instead to formulate and publish objective ground rules."  411 U.S. at 536. Further, the court held that, while Section 5 had not specifically authorized the Attorney General to issue regulations, his choice to make rules available to facilitate the

administration of Section 5 clearly was permissible if the guidelines are "reasonable and do not conflict with the Voting Rights Act itself."  Id.

Similarly, in publishing the January 18, 2001 Guidance memorandum, the Attorney General is providing "objective ground rules" to Section 5 jurisdictions in light of recent court decisions relevant to the review of redistricting submissions which are "reasonable and do not conflict" with relevant law. Enactment of both the guidelines and Guidance is well within the scope of authority that the Attorney General enjoys under Section 5.

In their response, plaintiffs appear to introduce a new allegation not included in their Complaint, arguing that the Guidance, and apparently the Section 5 guidelines, should be accorded no deference by this court because they constitute rulemaking which is not in compliance with the notice and comment requirements of Section 4 of the Administrative Procedure Act, 5 U.S.C. 553.

Plaintiffs' claims with respect to the A.P.A. are wrong.  In Georgia v. United States, supra, the Supreme Court held that where the Voting Rights Act of 1965 did not itself prescribe procedures to be employed by the Attorney General, the Attorney General as head of an executive department was authorized to prescribe regulations in accordance with his authority under 5

U.S.C. 301. 411 U.S. at 535.[7/] Thus, the provisions of the A.P.A. referenced by plaintiffs do not extend to or reach the Attorney General's Guidance or guidelines, as 5 U.S.C. 553 (b)(A) specifically exempts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" from the statute's notice and hearing provisions.

The Attorney General's Guidance and guidelines are due the deference determined appropriate by this Court. Most recently, as indicated above, a three-judge court of the District of South Carolina cited favorably to the Attorney General's Guidance and regulations in its interpretation and application of Section 5 in proceedings concerning South Carolina's redistricting plans. Colleton County, supra at 57. This Court similarly is free to utilize the Attorney General's "objective ground rules" for Section 5 as it sees fit to assist in its retrogression analysis of the 2001 Louisiana House plan.[8/]

---

[7/] Specifically, 5 U.S.C. 301 states "[t]he head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers and property."

[8/] Plaintiffs make a cursory allegation, not found anywhere in the Complaint, that the Attorney General's review process violates the Due Process Clause. Response, p. 24, fn. 15. The Attorney General's exercise of authority under Section 5 is not subject to judicial review. Morris v. Gressette, supra. Moreover, because a covered jurisdiction under Section 5 has the option of pursuing administrative or judicial preclearance at the outset of the Section 5 process and has the option of seeking

Although, as indicated above, it is far from clear as to what plaintiffs are requesting of this Court in Count III, it appears in the end that they may be simply asking the Court to utilize its independent judgment and discretion in conducting its retrogression analysis of the State of Louisiana's 2001 redistricting plan. But that has always been the case in a Section 5 declaratory judgment action and defendant expects this Court to make its decision in this action based on its own view of the existing caselaw implicating Section 5, as well as according whatever deference it believes is appropriate to the Attorney General's Section 5 guidelines and Guidance.[9]

In their Response at pp. 42-43, plaintiffs set forth their view as to certain aspects of the legal analysis which this Court

---

reconsideration or de novo review following the Attorney General's determinations, plaintiffs' due process claims are without merit.

[9] In any event, plaintiffs' attack on the Section 5 legal analysis set forth in the Attorney General's Guidance is without merit. As discussed above and in great detail in Defendant's Motion to Dismiss, the legal analysis in the Guidance concerning the proper benchmark to be used in a Section 5 analysis of a redistricting plan is consistent with established caselaw. See Colleton County, supra. Second, plaintiffs' contention that evidence of legislative intent is irrelevant to a preclearance determination is just plain wrong. Evidence of an intent to retrogress minority voting strength could preclude Louisiana from obtaining the requested declaratory judgment. Reno v. Bossier Parish School Board, 520 U.S. 471 (1997)(Bossier I). Information regarding the process by which the redistricting plan was adopted or the intent of the decisionmakers is relevant to determining whether the State has met its Section 5 burden. Id.; Reno v. Bossier Parish School Board, 528 U.S. 320 (2000)(Bossier II).

should conduct in its retrogression determination.  To the extent that plaintiffs are simply advising the Court of its legal views, such advice is premature and irrelevant to the current issues before the Court raised by Defendant's Motion to Dismiss.  To the extent that plaintiffs are requesting of this Court an advisory opinion on its Section 5 legal views prior to this Court's actual analysis of Louisiana's 2001 House redistricting plan, as discussed in Defendant's Motion to Dismiss, such a legal exercise is not an appropriate one for this Court in a Section 5 proceeding.

IV.  Conclusion

For the reasons set forth above and in Defendant's Motion to Dismiss, Count I and Count III of the Complaint in this action should be dismissed.

                              Respectfully submitted,

ROSCOE C. HOWARD, JR.   RALPH F. BOYD, JR.
United States Attorney   Assistant Attorney General

                              _____
                              JOSEPH D. RICH (D.C. Bar No. 463885)
                              Chief
                              BRIAN F. HEFFERNAN (VA Bar No. 17197)
                              KRISTEN M. CLARKE (NY Bar)
                              Attorneys
                              Voting Rights Section
                              Civil Rights Division
                              U.S. Department of Justice
                              950 Pennsylvania Ave., N.W.
                              Washington, D.C. 20530
                              (202) 514-4755